UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| | ) | |
| JESNY ANN JOSEPH, <u>et al.</u> | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case Number: 1:07CV0393(PLF) |
| | ) | |
| MICHAEL CHERTOFF, Secretary, United States | ) | |
| Department of Homeland Security, <u>et al.</u> | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## MOTION TO DISMISS OR TRANSFER

Defendants Michael Chertoff, <u>et al.</u>, through undersigned counsel, hereby move for dismissal of the complaint pursuant to Rule 12(b)(1) for lack of jurisdiction or, in the alternative, pursuant to Rule 12(b)(6) for failure to state a claim. In the alternative, Defendants move that the case be transferred to the Eastern District of Michigan. A proposed order and memorandum of points and authorities are attached hereto.

Dated: October 12, 2007

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

_____/s/ Robin M. Meriweather_____
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530
Phone: (202) 514-7198 Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                      )
JESNY ANN JOSEPH, et al.                              )
                                                      )
                        Plaintiffs,                   )
                                                      )
            v.                                        )    Case Number: 1:07CV0393(PLF)
                                                      )
MICHAEL CHERTOFF, Secretary, United States            )
Department of Homeland Security,  et al.              )
                                                      )
                        Defendants.                   )
                                                      )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR IN THE
ALTERNATIVE TO TRANSFER**

**INTRODUCTION AND SUMMARY**

This case concerns three separate applications filed by Plaintiffs:  a Form I-130 petition

for alien relative, a Form I-485 "adjustment of status" application, and a Form I-765 employment

authorization application.  The Form I-130 was filed by Plaintiff Jesny Joseph (Joseph) on behalf

of Plaintiff Vinod Mathew (Mathew) seeking to classify him as her spouse.  The Forms I-485 and

I-765 were filed by Mathew seeking employment authorization and requesting that Defendant

United States Citizenship and Immigration Services ("USCIS") exercise its discretion and make

him a lawful permanent resident of the United States.  Since the complaint was filed, USCIS has

approved Joseph's I-130 and Mathew's I-765.  USCIS has not completed its adjudication of

Mathew's I-485 application because the national security screenings — which the FBI conducts

for all adjustment applicants — are not yet complete.

Plaintiffs ask the Court to order USCIS to immediately complete its adjudication of the I-

1

130, I-485, and I-765.  Plaintiffs also challenge policies and procedures which establish the

intervals at which aliens must apply for employment authorization and appear for fingerprinting.

The Court lacks subject matter jurisdiction to review any of those claims, and Plaintiffs'

complaint should be dismissed.

The claims seeking immediate adjudication of Joseph's I-130 and Mathew's I-765 are

moot.  Those applications were granted by USCIS after the complaint was filed, which eliminated

any live controversy that might previously have existed between the parties.  The Court therefore

lacks subject matter jurisdiction over those claims.

Although Joseph's I-485 remains pending, the Immigration and Naturalization Act

("INA") deprives this Court of jurisdiction to review the timing of USCIS's processing of that

application.  Congress expressly withdrew judicial review of all issues concerning USCIS's

"judgments" regarding the granting of an adjustment application, and all discretionary USCIS

actions or decisions concerning adjustment applications and other immigration matters.  8 U.S.C.

§ 1252(a)(2)(B).  USCIS has determined that its adjudication of Mathew's I-485 application

cannot be completed until the relevant background checks have been completed. That

determination is a judgment, a discretionary action, and a decision.  The INA's  jurisdiction-

stripping provisions apply "notwithstanding any other provision of law," thereby foreclosing

reliance on alternative sources of jurisdiction like the Mandamus Act and the Administrative

Procedures Act ("APA").  Id.  Further, the APA expressly provides that if another statute

forecloses judicial review of agency action, the APA cannot be used to challenge that agency

action. See 5 U.S.C. §§ 701(a), 702.

Even if the INA did not bar review under the Mandamus Act and the APA, the Court

would still lack subject matter jurisdiction.  The extraordinary remedy of mandamus is available

2

only if the plaintiff has a clear right to relief and the defendant owes the plaintiff a clear, nondiscretionary duty to act. Mathew has no right, let alone a clear one, to have his adjustment application adjudicated within any specific time frames, or to bypass the mandatory background checks. Likewise, USCIS has no clear nondiscretionary duty to complete adjudication before those mandatory background checks have been completed, regardless of how long the checks have been pending. Those factors also prevent Mathew from invoking the APA as a source of jurisdiction, because the APA precludes judicial review of actions and decisions over which Congress has given an agency plenary discretion. That bar applies here because USCIS has complete discretion to require that adjustment applicants clear background checks prior to obtaining final adjudication of their applications.

The Court lacks jurisdiction over Plaintiffs' policy challenges for substantially the same reasons. Defendants have determined that employment authorizations should last for a limited period of time, and that applicants' fingerprints should be updated periodically. Neither the INA nor federal regulations constrain USCIS's discretion to require aliens to comply with those rules. Thus the INA bars judicial review of those policies, and the policies' discretionary nature would preclude review under the APA even if the INA did not apply.

Assuming _arguendo_ that this Court did have subject matter jurisdiction to review Mathew's challenge to the pace of USCIS's adjudication of his I-485, Mathew would be unable to state a claim for unreasonable agency delay. The D.C. Circuit has identified several factors courts should consider when determining whether an agency has unreasonably delayed final action, two of which are particularly significant here. First, as noted, there is no statutory timetable for adjudicating adjustment applications. Second, USCIS and the FBI have an interest in processing adjustment applications and background checks on a first-in, first-out basis, and in ensuring that

3

lawful permanent residence status is not granted to individuals whose permanent residence in the United States would raise national security concerns. Moreover, the D.C. Circuit has declined to intervene in agency delay cases when "a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain." Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003). Giving Mathew's application precedence over others' presents exactly that type of situation.

Finally, Defendants move in the alternative to transfer this case to the United States District Court for the Eastern District of Michigan. The only nexus between this District and the case is the fact that the agency heads named as defendants have offices in D.C. However, most of the events giving rise to this complaint — namely, the processing and adjudication of Mathew's I-485 — have transpired in the Detroit District office of USCIS. Accordingly, the Eastern District of Michigan is a more appropriate forum for this case than this Court, and the interests of justice support transfer.

## BACKGROUND

### A.    Statutory and Regulatory Background

1.    Adjustments of Status and Background Investigations

The Immigration and Nationality Act permits the Attorney General "in his discretion and under such regulations as he may prescribe," to adjust the status of an alien "to that of an alien lawfully admitted for permanent residence." 8 U.S.C. § 1255(a). Aliens like Joseph that seek such adjustments of status file applications referred to as an "I-485." The procedures for admitted aliens to apply for adjustment of status are set forth at 8 C.F.R. part 245.

USCIS processes adjustment applications in chronological order based on the date of receipt. Neither the statute nor the regulations establish a time frame in which adjudication must

4

occur.  The applicant must show that he is not inadmissible to the United States under any statutory ground of inadmissibility set forth at section 212(a) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a), including health-related, criminal, terrorist, and other grounds.  See 8 U.S.C. § 1255(a)(2).  An alien seeking adjustment of status bears at all times the burden of persuading the Attorney General to exercise his discretion in the alien's favor.  See Randall v. Meese, 854 F.2d 472, 474 (D.C. Cir. 1988); Jain v. Immigration and Naturalization Service, 612 F.2d 683, 687 (2d Cir. 1979); see generally Elkins v. Moreno, 435 U.S. 647, 667 (1978) ("... adjustment of status is a matter of grace, not right ...").

Before a decision is rendered on an alien's I-485 application for adjustment of status, USCIS, in conjunction with the FBI, conducts several forms of security and background checks to ensure that the alien is admissible, is not a risk to national security, and merits a favorable exercise of discretion.  See Declaration of Donna B. Davis, ¶¶ 4-6 (Exh. 1) ("Davis Decl.").  These checks currently include: (a) an FBI fingerprint check; (b) a check against the Interagency Border Inspection System (IBIS), which is managed by the Department of Homeland Security and contains records and "watch list" information from more than twenty law enforcement and intelligence agencies; and (c) an FBI name check.  Id. ¶ 5; see also 8 U.S.C. § 1105(a) (authorizing "direct and continuous liaison" with the Directors of the FBI and CIA to obtain and exchange information for use in enforcing the INA and in the interest of the internal and border security of the United States).

These security checks sometimes raise issues affecting an applicant's eligibility for an immigration benefit.  See Davis Decl. ¶ 2.  In those cases, USCIS must conduct further inquiry to resolve any outstanding issues, and in some cases may initiate proceedings to remove the alien from the United States.  Id. ¶ 5; Declaration of Douglas S. Pierce, ¶ 5 (Exh. 2) ("Pierce Decl.").

5

USCIS cannot complete its adjudication of a request for permanent residence until all security checks have been completed, and until any and all issues that arise from those checks have been resolved.  Davis Decl. ¶ 7; Pierce Decl. ¶ 5.

Because of heightened national security concerns, a review of the background check procedures employed by USCIS was conducted in November 2002.  See Decl. of Michael A. Cannon, ¶ 23 (EExh. 3) ("Cannon Decl.").  It was determined that more detailed, in-depth clearance procedures were required in order to better protect the people and the interests of the United States.  See id.  The name check clearance performed by the FBI was one of the procedures that needed revision.  See id.  Prior to November 2002, only those "main" files that could be positively identified with an individual were considered responsive.  See id.  The FBI subsequently altered its search criteria because the risk of missing a match to possible derogatory record(s) was too great.  See id.  Therefore, the search criteria were expanded to access reference files in addition to the main files.  See id.  From a processing standpoint, this change meant the FBI would have to review many more files for each individual.  See id.

In December 2002 and January 2003, USCIS resubmitted 2.7 million name check requests to the FBI in addition to the regular submissions.  See id. ¶ 24.  Over 440,000 of the responses to the 2.7 million resubmitted name check requests indicated that the FBI may have information relating to the subjects.  See id.  The FBI's processing of the more than 440,000 resubmissions that require follow-up to resolve the name checks has delayed the processing of the regular submissions from USCIS.  See id. ¶ 25.  Several other factors, including the total volume of incoming name checks, the number of hits on a name when it is reviewed, and the processing of common names, contribute to potential delays in processing background checks for an applicant.

6

<u>See</u> <u>id.</u> ¶¶ 26-30.  The FBI processes name check requests on a first-in, first-out basis (unless USCIS specifically requests that a particular name check be expedited).  <u>See</u> <u>id.</u> ¶ 18.

2.     <u>Judicial Review of Immigration-Related Decisions</u>

In 1996, Congress passed legislation to reduce, and in some cases eliminate, judicial review of certain immigration-related decisions made by the former Immigration and Naturalization Service ("INS").  <u>See</u> Sec. 306, Illegal Immigration Reform and Immigration Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009 (September 30, 1996).  In particular, 8 U.S.C. § 1252(a)(2)(B)(ii), divests courts of jurisdiction to review any "decision or action of the Attorney General the authority for which is specified … to be in the discretion of the Attorney General, other than the granting of [asylum]."

Because some courts, contrary to Congress' desires, found that this jurisdiction-stripping bar applied only to discretionary decisions made during removal (deportation) proceedings, on May 11, 2005, Congress amended Section 1252(a)(2)(B)(ii) to clarify that its proscription against judicial review applies regardless of whether the discretionary judgment, decision or action is made in removal proceedings.  <u>See</u> Section 101(f), Real ID Act of 2005, Pub. L. 109-13, Div. B, 119 Stat. 231; <u>see</u> <u>also</u> House Conference Report 109-72 at 170 (May 3, 2005).  The REAL ID Act also added references to the Secretary of Homeland Security consistent with the reorganization of INS (under the Attorney General and U.S. Department of Justice) into USCIS (under the Department of Homeland Security).  <u>Id</u>.  After passage of the Real ID Act, the statute reads as follows:

(B) Denials of discretionary relief

Notwithstanding any other provision of law (statutory or nonstatutory) . . . and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review–

7

(**I**) any judgment regarding the granting of relief under section 1182(h), 1182(I), 1229b, 1229c, or 1255 of this title, or

(**ii**) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. 1252(a)(2)(B).

### B.    Plaintiffs' Applications

On April 15, 2005, Plaintiff Joseph, a United States citizen, and Plaintiff Mathew, a native and citizen of India, filed a Form I-130, Petition for Alien Relative, and Form I-485 application to register permanent residence or adjust status.  See Compl. ¶¶ 19, 20.  The applications were filed with United States Citizenship and Immigration Service's ("USCIS") National Benefits Center (NBC), which subsequently transferred them to the Detroit District office.  See Davis Decl. ¶ 8. On June 29, 2007, the Detroit District office approved the Form I-130 filed by Joseph.  See id. ¶ 8; Pierce Decl. ¶ 7.  The Detroit District office currently maintains the records concerning Mathew's I-485, and is the USCIS office that is processing Mathew's application.  See Pierce Decl. ¶ 7.  On March 12, 2006, Mathew filed an application for employment authorization with the NBC.  See Davis Decl. ¶ 9.  On May 25, 2007, that application was approved, providing Mathew with employment authorization until May 24, 2007.  See id.

Shortly after Mathew's application for adjustment of status was filed, USCIS requested that the FBI conduct background checks in connection with Mathew's I-485.  See Davis Decl. ¶ 8.  Those checks are not yet complete.  See Pierce Decl. ¶¶ 7-8; Cannon Decl. ¶ 41.  The Detroit District office regularly audits the status of the background checks, but cannot complete its adjudication of the I-485 until it receives the results of those checks.  See Pierce Decl. ¶ 7.  The FBI will transfer the results of the background check to USCIS after the investigation is complete.

<u>See</u> Cannon Decl. ¶ 21.

Plaintiffs initiated this action with a mandamus complaint filed February 23, 2007. The complaint asks the Court to order USCIS to adjudicate the Forms I-130, Form I-485, and Form I-130 and declare certain policies and procedures relating to employment authorization in violation of the INA and arbitrary and capricious. Compl. at IX.

## STANDARD OF REVIEW

Defendants move for dismissal under Rule 12(b)(1) because the Court lacks subject matter jurisdiction to review Plaintiffs' claims. <u>See</u> Fed. R. Civ. P. 12(b)(1). When reviewing a 12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor." <u>Thompson v. Capitol Police Bd.</u>, 120 F. Supp.2d 78, 81 (D.D.C. 2000) (citations omitted); <u>see also</u> <u>Vanover v. Hantman</u>, 77 F. Supp.2d 91, 98 (D.D.C. 1999). "The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." <u>Rann v. Chao</u>, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), <u>aff'd</u>, 346 F.3d 192 (D.C. Cir. 2003). In addition, plaintiff bears the burden of persuasion, and must establish subject-matter jurisdiction "by a preponderance of the evidence." <u>Thompson</u>, 120 F. Supp.2d at 81; <u>Vanover</u>, 77 F. Supp.2d at 98. To determine the existence of jurisdiction, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. <u>See</u> <u>Herbert v. Nat'l Academy of Sciences</u>, 974 F.2d 192, 197 (D.C. Cir. 1992); <u>Rann</u>, 154 F. Supp. at 64.

Defendants also move for dismissal under Rule 12(b)(6), for failure to state a claim upon which relief can be granted. Rule 12(b)(6) requires dismissal if a plaintiff fails to plead "enough facts to state a claim for relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 127

S.Ct. 1955, 1974 (2007) (abrogating prior standard which required the moving party to show that

plaintiff can prove no set of facts in support of its claim which would entitle it to relief). The

Court must resolve all factual doubts in favor of the plaintiff, and allow the plaintiff the benefit of

all inferences. See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir.

1997).

## **ARGUMENT**

### I.    THE COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW PLAINTIFFS' CLAIMS.

"Federal courts are courts of limited jurisdiction . . . [and] possess only that power

authorized by Constitution and statute." Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377

(1994); see also Shaffer v. Veneman, 325 F.3d 370, 372 (D.C. Cir. 2003) (noting that district

courts "have only such jurisdiction as the Constitution and the Congress grant them"). Here,

Plaintiffs have failed to establish a statutory basis for the Court to exercise jurisdiction over their

claims. The claims relating to two of the applications have become moot. The remaining claims

must be dismissed because Congress has expressly deprived courts of jurisdiction to review

USCIS decisions and policies like the ones challenged here. Section 1252 of the Immigration and

Nationality Act ("INA") precludes judicial review of USCIS's "judgments" on applications for

adjustment of status, and of numerous other discretionary decisions involving immigration-related

applications and proceedings. 8 U.S.C. § 1252(a)(2)(B). That provision applies "notwithstanding

any other provision of law," thereby trumping any alternative source of jurisdiction. Id.

Even if the INA did not preempt other sources of jurisdiction, there would be no such

alternative source available here. The discretionary nature of the adjudication of adjustment of

status applications removes them from the scope of the Mandamus Act and the Administrative

Procedures Act.  Plaintiffs' policy challenges also seek review of Defendants' discretionary

decisions. Therefore, Rule 12(b)(1) requires dismissal of Plaintiffs' claims.

A.    <u>The Claims Requesting Adjudication of Joseph's Form I-130 and Mathew's
Form I-765 are Moot.</u>

The Supreme Court has held that for a case or controversy to be "justiciable" under the

Constitution, it must be "extant at all stages of review, not merely at the time the complaint is

filed." <u>Arizonans for Official English v. Arizona</u>, 520 U.S. 43, 67 (1997); <u>see also</u> <u>Columbian

Rope Company v. West</u>, 142 F.3d 1313, 1316 (D.C. Cir. 1998).  The existence of a live

controversy at all stages of litigation is necessary for a federal court to exercise its power.  <u>See

Steffel v. Thompson</u>, 415 U.S. 452, 459 n.10 (1974);  <u>Columbian Rope</u>, 142 F.3d at 1316;

<u>Friedman's Inc. v. Dunlap</u>, 290 F.3d 191, 197 (4th Cir. 2002).  Therefore, when a case becomes

moot while pending before the court, the court loses jurisdiction.  <u>See</u> <u>City of Houston v.

Department of Housing and Urban Dev.</u>, 24 F.3d 1421, 1426 (D.C. Cir. 1994); <u>Friedman's Inc.</u>,

290 F.3d at 197.

In mandamus actions seeking adjudication of a pending immigration application, the

mootness doctrine comes into play when the application has been processed.  <u>See</u> <u>Bouguettaya v.

Chertoff</u>  472 F.Supp.2d 1, 2 (D.D.C. 2007) (finding alien's request for writ of mandamus to

compel CIS to process application was moot because application was denied following filing of

the action).  As in other mandamus actions seeking to compel agency action, immigration cases

become moot when the agency takes action which grants the relief requested in the mandamus

petition.  <u>See</u> <u>Thompson v. United States Dep't of Labor</u>, 8 13 F.2d 48, 51 (3d Cir.1987) (action

for declaratory and mandamus relief from hold placed on administrative complaint rendered moot

when agency reactivated complaint); <u>Gray v. Office of Pers. Mgmt.</u>, 771 F.2d 1504, 1514 (D.C.

11

Cir 1985) (mandamus to compel agency decision became moot when agency rendered decision). Such cases are properly dismissed on mootness grounds because there is no further judicial function for the Court to perform.  See Tijerina v. Walters, 821 F.2d 789, 799 (D.C. Cir. 1987); Perry v. Block, 684 F.2d 121, 125 (D.C. Cir. 1982); Trueblood v. Dep't of Treasury, 943 F. Supp. 64, 67 (D.D.C. 1996).

Plaintiffs have requested, among other things, that the court order the Defendants to adjudicate the Form I-130 filed by Joseph and the Form I-765 filed by Mathew.  Both applications have been approved. See Davis Decl. ¶ 9, Pierce Decl. ¶ 7.   The approval of those applications moots Plaintiffs' claims concerning the adjudication of those applications, thereby depriving this Court of jurisdiction over those claims.

Plaintiffs' request for attorney's fees and costs does not prevent application of the mootness doctrine in this case.  To be sure, the grant of the Forms I-130 and I-765 did not satisfy Plaintiffs' desire for fees and costs.  However, a party's request for attorney's fees is "collateral to, and separate from" the merits.  Shultz v. Crowley, 802 F.2d 498, 502 (D.C. Cir. 1986). Accordingly, a fee request does not preserve a case that is otherwise moot.  Friends of Keeseville, Inc. v. F.E.R.C., 859 F.2d 230, 233 n.7 (D.C. Cir. 1988); American Council for the Blind v. Washington Metro. Area Trans. Auth., 133 F. Supp. 2d 66, 72 n.1 (D.D.C. 2001).

In any event, Plaintiffs are not entitled to fees or costs for those claims.  "The Court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section [5 U.S.C. § 552] in which the complainant has substantially prevailed."  5 U.S.C. § 552(a)(4)(E).  Here, Plaintiffs have not "prevailed" on those claims because the Court has not awarded them any relief.  See Oil, Chem. & Atomic Workers Int'l Union v. Dep't of Energy, 288 F.3d 452, 456-57 (D.C. Cir. 2002); see also Buckhannon Bd.

& Care Home, Inc. v. West Va. Dep't of Health and Human Res., 532 U.S. 598, 605 (2001) ("We cannot agree that the term 'prevailing party' authorizes federal courts to award attorney's fees to a plaintiff who, by simply filing a nonfrivolous but nonetheless potentially meritless lawsuit (it will never be determined), has reached the 'sought-after destination' without obtaining any judicial relief."). Accordingly, USCIS's voluntary approval of the I-130 and I-765 applications deprives Plaintiffs of any claim for fees or costs.

Given that the claim concerning the I-130 is the only claim that involves Joseph's rights, the fact that it has become moot requires that she be dismissed as a plaintiff from this action. Joseph is a United States Citizen, who by definition does not have a pending I-485, and will not be required to apply for employment authorizations or have her fingerprints taken. Accordingly, she lacks standing to join Mathew in challenging the adjudication of Mathew's I-485 and the policies requiring aliens to be fingerprinted and re-submit their employment authorization applications on a periodic basis. See Chun v. Powell, 223 F. Supp. 2d 204, 207 (D.D.C. 2002) (concluding plaintiff lacked standing to challenge denial of his sister's visa even though he sponsored the application); see also Sadowski v. Bush, 293 F. Supp. 2d 15, 19 (D.D.C. 2003) (citizen lacked standing to challenge alleged failure of agency defendants to enforce immigration laws against aliens).

    **B.**    **The Claim Requesting Adjudication of Mathew's Form I-485 Should Be Dismissed Under Rule 12(b)(1) Because 8 U.S.C. § 1252(a)(2)(B) Divests This Court of Jurisdiction over that Claim.**

Section 1252(a) of the INA expressly precludes judicial review of adjustment of status applications and other discretionary decisions. As noted supra, Section 1252(a)(2)(B), provides that "no court shall have jurisdiction to review:"

        (i)      any judgment regarding the granting of relief under section

1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or

(ii)     any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this title to be <u>in the discretion of the Attorney General or the Secretary of Homeland Security,</u> . . . .

8 U.S.C. § 1252(a)(2)(B) (emphasis added).

That provision bars judicial review of Mathew's attempt to compel the adjudication of his adjustment of status application. First, the authority to adjudicate adjustment of status applications arises under 8 U.S.C. § 1255(a), and subsection (i) expressly bars judicial review of "any judgment regarding the granting" of such an application. 8 U.S.C. §§ 1252(a)(2)(B)(i), 1255(a). It follows that the Court cannot review USCIS's judgment that its adjudication of Mathew's application cannot be completed until the FBI has completed processing the background checks.

Second, because the adjudication of an adjustment of status application is expressly committed to the discretion of the Secretary of Homeland Security, Section 1252(a)(2)(B)(ii) also divests this Court of subject matter jurisdiction over Mathew's request for immediate adjudication of his Form I-485. <u>See, e.g.</u>, <u>Grinberg v. Swacina</u>, 2007 WL 840109 (S.D.Fla. March 20, 2007) (discussing Section 1252(a)(2)(B) and granting motion to dismiss); <u>Safadi v. Howard</u>, 2006 WL 3780417 (E.D. Va.)(same); <u>Sharkey v. Ganter</u>, 2006 WL 177156 (S.D.N.Y.)(same). <u>But</u> <u>see e.g.</u>, <u>Duan v. Zamberry</u>, 2007 WL 626116 (W.D.Pa. 2007) (finding jurisdiction notwithstanding Section 1252(a)(2)(B)(ii)); <u>Elmalky v. Upchurch</u>, 2007 WL 940330 (N.D.Tex. 2007) (same). Section 1252(a)(2)(B)(ii) applies broadly to bar courts from reviewing any "decision or action" (other than asylum determinations) the "authority for which is specified . . . to be discretion[ary]" under "this subchapter." In seeking to compel the adjudication of an adjustment of status application under 8 U.S.C. § 1255, Mathew's claim fall squarely within the plain meaning of each

14

of these terms.

First, "this subchapter" refers to Subchapter II of Chapter 12 of Title 8 of the U.S. Code, which is composed of 8 U.S.C. §§ 1151 through 1378. Section 1255(a), which grants the Attorney General discretionary authority to adjudicate adjustment of status applications, is thus part of Subchapter II. The "authority" for adjudicating adjustment of status applications is expressly "in the discretion of the Attorney General," pursuant to Section 1255(a). See 8 U.S.C. § 1255(a) (providing that an alien's status "*may* be adjusted by the Attorney General, *in his discretion* and under such regulations as he may prescribe." Id. (emphasis added)). The statute provides no time frame for the adjudication of I-485 applications, and gives the Attorney General complete discretion to prescribe any appropriate regulations. See id. Thus Congress has given the Attorney General complete discretion over the process of adjudicating an I-485 application. That discretion necessarily extends to the assessment of when, whether, and how to grant an adjustment application. Those factors have led numerous courts to conclude that Section 1252(a)(2)(B)(i) bars judicial review of claims challenging aspects of the I-485 adjudicative process. See Dinsey v. Department of Homeland Security, No. 03-10081, 2004 WL 1698630, at * 4 (S.D.N.Y. 2004) (finding no jurisdiction over action to compel USCIS to adjudicate adjustment of status application because the INA "expressly places the adjustment of immigration status within the discretion of the Attorney General"); see generally Zhu v. Gonzales, 411 F.3d 292, 294-96 (D.C. Cir. 2005) (concluding 1252(a) precludes judicial review of Attorney General's discretionary decision to require party to obtain labor certification prior to obtaining a work visa); Mahaveer, Inc. v. Bushey, No. 04-1275, 2006 WL 1716723, at *3-*4 (D.D.C. June 19, 2006) (concluding 1252(a) bars review of discretionary denial of visa).

Finally, Mathew is seeking judicial review of both an agency decision and agency action.

15

USCIS has, at this time, made a *decision* that it cannot immediately complete its adjudication of Mathew's application because it is awaiting potentially relevant information from the mandatory security checks. This case also involves agency *action*. The word "action" is not limited to a single act, but also includes an ongoing process or a series of acts. See Safadi, 466 F. Supp. 2d at 699 (citing Black's Law Dictionary 28 (6th ed. 1990) defining action as "[c]onduct; behavior; something done; the condition of acting; an act or series of acts."); see also Grinberg v. Swacina, 478 F. Supp. 2d 1350, 1352 (S.D. Fla. 2007) (finding initiation of background checks was action); Zhang v. Chertoff, ___ F. Supp. 2d ___, 2007 WL 175358, at *4 (W.D. Va. June 19, 2007) ("the preclusion of judicial review over a discretionary act of USCIS encompasses . . . the pace of this process"). As explained in the Pierce declaration, USCIS is engaged in the continuing "action" of adjudicating Mathew's adjustment application and auditing his file, but is actively awaiting the results of the security checks. See Pierce Decl. ¶ 4. Thus this is not a case in which an agency has refused to act. Instead, the alleged delay is a direct consequence of USCIS's conclusion that national security interests preclude it from completing its adjudication of Mathew's application until all background investigations are complete. See Li v. Chertoff, 482 F. Sup. 2d 1172, 1177-78 (S.D. Cal. 2007).

At bottom, Mathew takes issue with the fact that USCIS is still engaging in investigative and evaluative activities to determine his eligibility. He would have the Court order USCIS to "immediately" adjudicate his application, notwithstanding the need for these critical inquiries and notwithstanding that the decision whether to grant adjustment of status and when to do so is completely discretionary. However, USCIS's *decision* to continue evaluating Plaintiff's application and the *action* it is taking in doing so lie within the discretion of the Attorney General under § 1255(a). Thus Section 1252(a)(2)(B)(ii) precludes judicial intervention in USCIS's

adjudicative process.  The withdrawal of subject matter jurisdiction in this regard is consistent

with the well-established proposition that judicial review in immigration matters is narrowly

circumscribed, see Reno v. Flores, 507 U.S. 292 (1993), and that control over immigration is

largely entrusted to the political branches of the government, see United States v. Valenzuela-

Bernal, 458 U.S. 858, 864 (1982); Mathews v. Diaz, 426 U.S. 67, 81 (1976).

　　　Defendants recognize that federal district courts are split on this issue, and that some

judges have concluded that they have jurisdiction to review the reasonableness of any delays in

completing adjudication of an I-485 petition.  Compare, e.g., Liu v. Novak, No. 07-263, ___ F.

Supp. 2d ___, 2007 WL 2460425 (D.D.C. Aug. 30, 2007) (exercising jurisdiction over claim

alleging unreasonable delay in resolving adjustment of status application); Alsharqawi v.

Gonzales, No. 06-1165, 2007 WL 1346667 (N.D. Tex. Mar. 14, 2007) (same) with Elzer v.

Mueller, No. 07-01666, 2007 WL 1221195 (E.D. Pa. Apr. 23, 2007) (dismissing challenge for

lack or jurisdiction);Grinberg, 478 F. Supp. 2d at 1352 (same).  However, the D.C. Circuit has not

yet addressed the issue, and the other courts' rulings are not binding on this Court.  As the

foregoing discussion makes clear, the INA's jurisdiction-stripping provisions are best read as

precluding judicial review of Mathew's claims concerning the adjustment of status application.

　　　**C.**　　　**No Other Statute Gives the Court Jurisdiction to Review Mathew's Challenge**
　　　　　　　**to the Pace of the Adjudication of His I-485 Application**.

　　　Even if some other statute conferred jurisdiction to review Mathew's claim relating to

adjudication of his Form I-485, the INA would foreclose the exercise of that jurisdiction because

it applies "notwithstanding any other provision of law (statutory or nonstatutory)." 8 U.S.C. §

1252(a)(2)(A);  see Danilov v. Aguirre, 370 F. Supp. 2d 441, 445 (E.D. Va. 2005) (Ellis, J.) ("[I]t

is well settled that general grants of jurisdiction may not be relied upon to expand a very specific

statute that either grants or limits jurisdiction.").  However there is no alternative source of

jurisdiction in this case.  The Mandamus Act does not apply because the process of adjudicating

Mathew's petition involves discretionary acts and decisions.  The Administrative Procedure Act

is inapplicable for similar reasons.

> **1.    The Mandamus Act Does Not Confer Jurisdiction Because The Adjudication of Mathew's Application Is Discretionary.**

The Mandamus Act would not confer subject matter jurisdiction even if the jurisdiction-

stripping provisions of INA § 242 did not apply.  That statute gives district courts "original

jurisdiction of any action in the nature of mandamus to compel an officer or employee of the

United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.

The writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary

causes."  Cheney v. United States District Court, 542 U.S. 367, 380 (2004) (internal quotations

and citation omitted); accord Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980).

District courts may issue a writ of mandamus only if three elements are met: "(1) the plaintiff has

a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate

remedy available to the plaintiff."  In re Medicare Reimbursement Litigation, 414 F.3d 7, 10

(D.C. Cir. 2005); see also Heckler v. Ringer, 466 U.S. 602, 616 (1984) (noting that defendant

must owe plaintiff "a clear nondiscretionary duty" and that all other remedies must be exhausted).

 Even when those factors are present, "a court may grant relief only when it finds 'compelling

equitable grounds.'"  In re Medicare Reimbursement Litigation, 414 F.3d at 10.

Here, Plaintiff lacks a clear right to immediate adjudication, and Defendant has no clear

mandatory or ministerial obligation to adjudicate the application within a particular time frame.

See Safadi v. Howard, 466 F.Supp.2d at 700; Grinberg, 478 F. Supp. 2d at 1354.  The decision

whether to grant or deny Plaintiff's adjustment application is plainly discretionary by statute. <u>See</u> 8 U.S.C. § 1255(a). Surely, that discretion permits USCIS to enforce a background check requirement thereby ensuring that immigration benefits are not granted to an alien ineligible for the benefit due to fraud, criminal convictions, or national security matters. There are no statutory provisions or regulations that mandate the adjudication of adjustment applications within a particular time frame. Consequently, USCIS has no clear, mandatory duty to finish adjudicating Mathew's application prior to completion of background checks, or by a prescribed deadline.

Those factors have led numerous district courts to find mandamus relief unavailable to compel immediate adjudication of applications for adjustment of status. <u>See, e.g.</u>, <u>Li</u>, 482 F. Supp. 2d at 1177; <u>Grinberg,</u> 478 F. Supp. 2d at 1354; <u>Safadi</u>, 466 F. Supp.2d at 700; <u>Saleh v. Ridge</u>, 367 F. Supp.2d 508, 511 (S.D.N.Y. 2005); <u>Karan v. McElroy</u>, No. 02 Civ. 6678 (JGK), 2003 WL 21209769, at *1 (S.D.N.Y. May 23, 2003); <u>Zheng v. Reno</u>, 166 F. Supp.2d 875, 880-81 (S.D.N.Y. 2001); <u>Sadowski v. INS</u>, 107 F.Supp.2d 451, 453 (S.D.N.Y. 2000). This Court should do the same. Mathew can establish no clear and indisputable right to have his adjustment of status application adjudicated within any specified time constraints, and USCIS has no obligation to adjudicate Mathew's application before the background investigations are complete. Likewise, Mathew can point to no clear and indisputable right to have the background checks completed within a specific time frame, and the FBI has no statutory or regulatory duty to limit background examinations to a fixed period of time. <u>See Shalabi v. Gonzales</u>, No. 06-866, 2006 WL 3032413, at * 5 (E.D. Mo. Oct. 23, 2006) (denying plaintiff's request that the court compel that plaintiff's background check be expedited). For all these reasons, Mathew is not entitled to the extraordinary relief of mandamus, and cannot rely on the Mandamus Act as a source of jurisdiction.

**2.    The Administrative Procedures Act Does Not Permit This Court to Review Mathew's Challenge to USCIS's Adjudication of his I-485.**

Mathew also has no right to judicial review under the APA. Although the APA is not an independent source of subject matter jurisdiction, it operates in tandem with federal question jurisdiction under 28 U.S.C. § 1331 to permit courts to review challenges to certain agency actions. See Califano v. Sanders, 430 U.S. 99, 107 (1977); Grinberg, 478 F. Supp. 2d at 1355; Galluci v. Chao, 374 F. Supp. 2d 121, 128 (D.D.C. 2005). However, the APA expressly precludes judicial review of agency actions in two circumstances: (1) if another statute "preclude[s] judicial review;" and (2) when "agency action is committed to agency discretion by law." 5 U.S.C.

§ 701(a)(2); Brock v. Pierce County, 476 U.S. 253, 260 n.7 (1986). Both factors prevent Mathew from using the APA as a means of challenging USCIS's processing of his adjustment application.

First, as discussed above, the INA bars judicial review of Mathew's claim. Accordingly, Section 701(a) of the APA, which "withdraws [an APA] cause of action" to the extent another statute "precludes judicial review," prevents Mathew from raising an APA challenge. Block v. Community Nutrition Inst., 467 U.S. 340, 345 (1984); see 5 U.S.C. § 701(a); Beyond Pesticides v. Whitman, 360 F. Supp. 2d 69, 71 (D.D.C. 2004); see generally Bruno v. Albright, 197 F.3d 1153, 1161-62 (D.C. Cir. 1999) (concluding that "the immigration laws preclude judicial review of consular visa decisions" and therefore bar APA challenges to a visa decision). Section 702 forecloses judicial review of Mathew's claim for the same reason, as it provides that "nothing herein affects other limitations on judicial review . . . or confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702.

Second, the APA bars judicial review because the USCIS actions Mathew has challenged are discretionary. The APA generally permits challenges to "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); see also 5 U.S.C. § 555(b) (indicating that agencies should conclude matters "within a reasonable time"). However, such claims are unreviewable by the courts if the relevant agency action is "committed to agency discretion by law." Id. § 701(a)(2). In Heckler v. Chaney, the Supreme Court interpreted 5 U.S.C. § 701(a)(2) to mean that "review is not to be had if the statute is drawn so that the court would have no meaningful standard against which to judge the agency's exercise of discretion." 470 U.S. 821, 830 (1985). As the Court explained, "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" Id.; see also Steenholdt v. Federal Aviation Admin., 314 F.3d 633, (D.C. Cir. 2003) (articulating same standard). "The principal purpose of the APA limitations . . . and of the traditional limitations upon mandamus from which they were derived—is to protect agencies from undue judicial interference with their lawful discretion . . . ." Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004).

Mathew has no APA cause of action for "unreasonable agency delay" because the timing of USCIS's adjudication of his adjustment of status application is expressly committed to agency discretion, as are all other aspects of processing of the application. Section 1255(a) permits the Attorney General to adjust an alien's status "*in his discretion* and under such regulations as he may prescribe." 8 U.S.C. § 1255(a) (emphasis added). That is the type of "plenary" grant of discretion which renders agency actions unreviewable under the APA. Secretary of Labor v. Twentymile Coal Co., 456 F.3d 151, 157 (D.C. Cir. 2006). No statutory or regulatory provisions provide a "meaningful standard" against which to measure USCIS's process of adjudicating such

21

an application.  Heckler, 470 U.S. at 830.  Rather, the agency maintains complete discretion to

determine "how and when" to adjudicate the application.  See id.  In contrast with certain other

immigration provisions, e.g., 8 U.S.C. § 1447(b), the statute and regulations governing Plaintiff's

adjustment of status application provide no time frame for when such an application must be

adjudicated.  See Zheng v. Reno, 166 F.Supp.2d at 879 ("[T]here is no requirement that the

application be decided within a specific period of time[.]").  Consequently, there is no standard

against which the Court can measure whether USCIS has acted "within a reasonable time,"

5 U.S.C. § 555(b), or "unreasonably delayed" adjudication, id. § 706(1).

       Given that broad discretion, Section 701(a)(2) of the APA precludes review of Mathew's

claims.  That ruling would be in accord with other courts' conclusion that claims relating to

alleged delays in the adjudication of an adjustment of status application are unreviewable under

the APA because the adjudicatory process is committed to agency discretion by law.  See Safadi,

466 F.Supp.2d at 700; Zheng, 166 F.Supp.2d at 878-89; Karan, 2003 WL 21209769, at *1

("[B]ecause decisions regarding the plaintiff's immigration status are committed to the discretion

of the INS, this Court lacks the authority under . . . the APA to grant the relief the plaintiff

seeks."); see also Rahman v. McElroy, 884 F.Supp. 782, 787-88 (S.D.N.Y. 1995).   In addition, at

least two Supreme Court cases suggest that the presence of a specified time period triggers courts'

ability to compel agency action that is "unreasonably delayed" under § 706(1).  See Norton, 542

U.S. at 65 ("Thus, when an agency is compelled by law to act within a certain time period . . . a

court can compel the agency to act . . . ."); Brock, 476 U.S. at 260 n.7 (finding that because "the

statutory command that the Secretary 'shall' act within 120 days does not commit such action to

the Secretary's discretion, . . . [t]he court would have the authority to 'compel agency action

unlawfully withheld or unreasonably delayed,' § 706(1)").

22

Without any mandatory time frame to adjudicate Plaintiff's claim that USCIS has "unreasonably delayed" adjudication of his application, this Court would have to create a temporal standard out of whole cloth. This is a perilous task given the national security considerations that affect USCIS's adjudicative process. It is a well-established proposition that judicial review of immigration matters is narrowly circumscribed, and that control over immigration is largely entrusted to the political branches of the government. See Valenzuela-Bernal, 458 U.S. at 864; Diaz, 426 U.S. at 81 ("Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary."). Moreover, as other courts have cautioned, in "'matters solely within the INS's discretion[,] . . . aside from our powerlessness to intervene, the judicial creation of such a duty would have the potential for mischievous interference with the functioning of already overburdened administrative agencies.'" Rahman, 884 F. Supp. at 787 (quoting Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1182 (2d Cir. 1978)); see also Heckler, 470 U.S. at 831-82 (noting that "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities"). Those principles counsel against the imposition of a judicially-created standard to gauge how long USCIS may wait for assurance that the background checks have identified no national security reasons that would merit denial of an applicant's adjustment application.

**D.    The Court Lacks Jurisdiction To Review Plaintiffs' Policy Challenge to the Intervals at Which USCIS Requires Applicants to Be Fingerprinted and Apply for Employment Authorizations.**

In addition to seeking an order compelling USCIS to adjudicate the applications pending

at the time the complaint was filed, Plaintiffs have made a broader challenge to certain requirements that must be met while an alien's I-485 remains pending. Specifically, Plaintiffs allege that the requirement that I-485 applicants' employment authorizations and fingerprints last for a fixed period of time, and must be renewed thereafter, is arbitrary and capricious, or otherwise contrary to law, in violation of the Administrative Procedure Act. The Court lacks jurisdiction over those claims for substantially the same reasons as it lacks jurisdiction to review Mathew's 'unreasonable delay' claim: they involve discretionary decisions that cannot be reviewed under the INA or APA.

As noted, the INA permits the Attorney General to adjust an alien's status "*in his discretion*, and *under such regulations as he may prescribe*, to that of an alien lawfully admitted for permanent residence" if the alien meets certain criteria. 8 U.S.C. § 1255(a) (emphasis added). Although Congress has expressly provided for employment authorizations in connection with other immigration benefits, e.g. 8 U.S.C. §§ 1160(a)(4) and 1255a(b)(3)(B), the INA is silent on the issue of whether and when applicants for adjustment of status shall be given employment authorizations. The INA is similarly silent concerning the terms on which applicants' fingerprints are taken. Thus nothing in the INA limits the discretion of the Attorney General or USCIS to require periodic fingerprinting and employment authorization applications from applicants for adjustment of status.

In light of Congress's silence, the intervals at which aliens must be fingerprinted and apply for employment authorizations are committed to the discretion of the Attorney General and the Secretary of Homeland Security. As part of the Attorney General's discretionary authority to implement procedures for adjustment of status, he promulgated regulations permitting applicants for adjustment of status to be granted employment authorization during the pendency of their

applications.  8 C.F.R. § 274a.12(c)(9).  Those regulations do not require that applicants be

granted employment authorizations that last indefinitely, or impose any other limitations on the

discretion of the Attorney General and Secretary of Homeland Security.  Accordingly, the entire

process for granting employment authorization to applicants for adjustment of status, including

the time limitations on such authorizations, is an exercise of Defendants' discretion.  See

Kaddoura v. Gonzales, No. 06-1402, 2007 WL 1521218, at *4-*5 (W.D. Wash. May 21, 2007).

     The Attorney General also has promulgated regulations requiring applicants to comply

with USCIS's requests that they appear for "biometrics capture," i.e., fingerprinting.  8 C.F.R.

§ 103.2(b)(13).  Pursuant to those regulations, if the applicant fails to appear for fingerprinting,

"the application shall be considered abandoned and denied."  Id. § 103.2(b)(13)(ii).  Those

regulations do not limit the frequency with which USCIS may require applicants to be

fingerprinted.  Accordingly, USCIS and the Attorney General retain unfettered discretion to

require that those biometrics periodically be updated.  That discretion makes perfect sense, given

the law enforcement and national security interests that the biometrics requirement serves.

     Thus both of the policies that Plaintiffs have challenged are committed to Defendants'

discretion.  As discussed supra, the INA insulates such discretionary decisions from judicial

review, and the APA does not provide an alternative basis for jurisdiction.  Accordingly, the

Court lacks jurisdiction to review Plaintiffs' challenge to the conditions and procedures for

fingerprinting applicants and granting employment authorizations, and the claims concerning

these conditions and procedures must be dismissed.  See generally Arzani v. United States

Attorney General, 2007 WL 1539951, at *2 (11th Cir. May 29, 2007) (finding Board of

Immigration Appeals' determination that applicant's removal application should be denied

because he failed to comply with the fingerprinting requirement was a "discretionary" decision

over which the court lacked jurisdiction).

**III.    IF THE COURT HAD SUBJECT MATTER JURISDICTION, THE CLAIM CHALLENGING THE PACE OF ADJUDICATING MATHEW'S I-485 WOULD FAIL TO STATE A CLAIM AND BE SUBJECT TO DISMISSAL UNDER RULE 12(B)(6).**

Even if the Mandamus Act or the APA could be construed as permitting this Court to review the reasonableness of the delay in completing the processing of Mathew's adjustment application, Rule 12(b)(6) would require dismissal of that claim. The D.C. Circuit has identified six factors courts should consider when reviewing claims that allege unreasonable agency delay:

 (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.' "

In re United Mine Workers of America Inter. Union, 190 F.3d 545, 547 (D.C. Cir. 1999) (quoting

Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 75-77, 79 (D.C. Cir. 1984)

("TRAC"). Where, as here, Congress has declined to establish a specific timetable for agency

action, the Court is "not free to ignore that judgment and rewrite the statute to include a specific

timetable." In re American Fed. of Govt. Employees AFL-CIO, 837 F.2d 503, 506 (D.C. Cir.

1988). The D.C. Circuit also has emphasized the importance of considering the agency's

competing priorities, noting that agencies should be given "great latitude in determining their

agendas." In re Monroe Comms. Corp., 840 F.2d 942, 946 (D.C. Cir. 1988).

The complaint does not allege facts sufficient to support Mathew's claim that USCIS has unreasonably delayed processing his adjustment application. As noted, Congress has established no timetable for processing adjustment applications. Further, the competing interests at issue in this case militate against granting Plaintiff the relief he seeks. The D.C. Circuit has "declined to grant relief, even when all the other factors considered in <u>TRAC</u> favored it, where a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain." <u>Mashpee Wampanoag Tribal Council, Inc. v. Norton</u>, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (citing <u>In re Barr Labs., Inc.</u>, 930 F.2d 72, 75 (D.C. Cir. 1991). Yet that is precisely what Mathew asks this Court to do. Defendants and the numerous individuals with pending adjustment applications have a strong interest in processing the applications in an orderly fashion and ensuring that all applicants are treated the same. Allowing any alien that files a lawsuit to leapfrog to the head of the queue would be contrary to those interests, and potentially would lead applicants with pending background checks to flood the federal courts with mandamus actions in order to obtain that advantage. As the Eastern District of Virginia has recognized,

> to grant relief in this case would set a dangerous precedent, sending a clear signal that more litigious applicants are more likely to be moved to the top of the proverbial pile over other applicants that have waited even longer. Such a situation hardly optimizes resources, and serves only the individual at the detriment to the group.

<u>Dmitrenko v. Chertoff</u>, No. 07-82, 2007 WL 1303009, at * 1 (E.D. Va. Apr. 30, 2007); <u>see also</u> <u>id.</u> at n. 1 ("To grant relief to today's petitioners, compelling adjudication of their application over persons that have waited even longer, would be far from equitable."). While Plaintiff may desire immediate adjudication of the application, he has no entitlement to that relief.

Finally, Defendants' obligation to protect national security is another "competing interest"

27

that makes any delay reasonable. Background checks serve an important law-enforcement and public safety purpose. See Li v. Chertoff, 482 F. Supp. 2d 1172, 1178 (S.D. Cal. 2007); Cannon Decl. ¶¶ 4, 17. Accordingly, courts have found it reasonable for an adjustment application to remain pending for long periods of time when the delay is attributable to an ongoing security investigation. See Zahani, 2006 WL 2246211, at *3 (noting "[c]ourts have routinely found delays caused by FBI background checks to be justifiable delays" and citing cases); Zheng v. INS, 933 F. Supp. 338, 341 (S.D.N.Y. 1996) (dismissing case pursuant to 12(b)(6) because delaying processing of application pending completion of background checks was not an unreasonable delay); Jabr v. Chertoff, No. 4:06cv00543, 2006 WL 3392504, at *2 (E.D. Mo. Nov. 21, 2006) (finding plaintiffs failed to state a claim for unreasonable agency delay although adjustment application had been pending for more than two years due to background checks). For all the foregoing reasons, Mathew has failed to state a claim for unreasonable delay in adjudicating his I-485.

## CI.    IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THE CASE TO THE EASTERN DISTRICT OF MICHIGAN.

This case is governed by the general venue statute, 28 U.S.C. § 1391, which establishes default rules for venue that apply to federal lawsuits where the underlying statutes do not specify their own venue rules. See 28 U.S.C. § 1391(a), (b), and (e) (each applying "except as otherwise provided by law."). Section 1391 identifies three possible bases for venue for claims against federal government officials or agencies: (1) where a defendant "resides;" (2) the district where "a substantial part of the events or omissions giving rise to the claim occurred;" or (3) where "the plaintiff resides, if no real property is involved in the action." 28 U.S.C. § 1391(e). Plaintiffs appear to rely on the first prong of this test, and allege that venue is proper in this Court because

28

the agency heads named as Defendants have offices in the District of Columbia.  Compl. ¶ 6.

When a plaintiff bases its venue arguments solely on federal agency defendants' presence in Washington D.C., the venue challenge should be examined  "very closely."  Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993).  That close scrutiny has led courts in this District to invoke their transfer authority pursuant to 28 U.S.C. § 1404(a) and transfer cases to a district with a closer nexus to the parties' dispute. See, e.g., Cameron, 983 F.2d at 256 (ruling Washington, D.C. was not the proper venue because the sole connection to Washington, D.C. was the inclusion of the Director of the Federal Bureau of Prisons and the Attorney General in their official capacities); Rosales v. United States, 477 F. Supp.2d 213, 215-17 (D.D.C. 2007) (transferring case against federal agency to district in which the challenged events took place); Southern Utah Wilderness Alliance v. Norton, 315 F. Supp.2d 82, 886-89 (D.D.C. 2005) (concluding environmental case should be transferred to Utah where D.C. officials only set general policies and did not make specific decisions being appealed); Joyner v. District of Columbia, 267 F. Supp.2d 15, 20-21 (D.D.C. 2003) (holding that the case's only connection to Washington, D.C. was the situs of named federal government defendants and transferring to a district with which the case had several connections).  Otherwise, "[b]y naming high government officials as defendants, a plaintiff could bring suit here that properly should be pursued elsewhere."  Cameron, 983 F.2d at 256.

The fact that Defendants are high government officials who reside in the District of Columbia does not establish a sufficient connection to this District, and the Court should transfer this case to the Eastern District of Michigan.  Section 1404(a) permits the Court to transfer this case to "any other district or division where it might have been brought" for the "convenience of parties and witnesses, in the interest of justice."  28 U.S.C. § 1404(a).  A threshold question is

whether the case could have been brought in the district to which transfer is sought.  See Stewart Organization v. Ricoh Corp., 487 U.S. 22, 29 (1988) (citing Van Dusen v. Barrack, 376 U.S. 612, 613 (1964)).  The Court then must engage in a case-by-case analysis and balance the private interests of the parties with public interests such as efficiency and fairness.  Id. at 29.  The moving party bears the burden to establish that it is proper to transfer the case.  See Southern Utah, 315 F. Supp. 2d at 86.  Trout Unlimited v. United States Dep't of Agriculture, 944 F.Supp. 13, 16 (D.D.C. 1996) (citing Air Line Pilots Ass'n v. Eastern Air Lines, 672 F.Supp. 525, 526 (D.D.C. 1987) (citations omitted).  Plaintiffs could have brought this case in the Eastern District of Michigan, and both the private and public interests favor transfer to that court.

The Eastern District of Michigan clearly is a district in which this case "might have been brought."  The Detroit District office is responsible for adjudicating Mathew's adjustment of status application; therefore any delay in the processing of that application concerns that office, which is located in Detroit, Michigan.  See Pierce Decl. ¶ 7.  As a result, the events or omissions giving rise to Plaintiffs' claim occurred in the Eastern District of Michigan, making venue proper in that court under 28 U.S.C. § 1391.

The private interests of the parties favor transfer.  The factors courts consider when assessing those interests include: Plaintiffs' choice of forum, Defendants' choice of forum, whether the claim arose elsewhere, convenience of the parties, convenience of the witnesses, and ease of access to sources of proof.  See Trout Unlimited, 944 F.Supp. at 16 (citation omitted).  Although courts generally accord substantial deference to a plaintiff's choice of forum, that deference is lessened when the forum chosen is not the plaintiff's home forum.  See Shawnee Tribe v. United States, 298 F.Supp.2d 21, 24 (D.D.C. 2002) (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)).  Courts also apply less deference when the chosen forum has an inadequate

30

nexus to the events in the case.  See <u>Southern Utah Wilderness Alliance</u>, 315 F. Supp.2d at 86.

Plaintiffs' choice of forum deserves little deference because they do not reside in this District, and because this District lacks meaningful ties to the controversy.  The Eastern District of Michigan is a more appropriate forum, because that is where the relevant decisions were made, and where Plaintiffs' claims arose.  As noted, the Detroit District Office is charged with adjudicating Mathew's adjustment application, which is the only application still pending.  <u>See</u> Pierce Decl. ¶ 7.  None of the named agency defendants have been involved in the adjudication of that application, or will be involved in any future adjudication.  Accordingly, this case is similar to other cases in which courts have found that the private interests favor transfer because the "primary issue in th[e] case" concerns a decision made by an agency field office, and not headquarters.  <u>Southern Utah Wilderness Alliance</u>, 315 F. Supp.2d at 87; <u>see, e.g., Rosales</u>, 477 F. Supp. 2d at 216; <u>Shawnee Tribe</u>, 298 F. Supp.2d at 24; <u>Sierra Club v. Flowers</u>, 276 F.Supp. 62, 67-68 (D.D.C. 2003) (transferring case because federal officials in Florida made the relevant decision and officials in Washington, D.C. were not involved in the decision-making process); <u>see also</u> <u>Airport Working Group of Orange County, Inc. v. United States Dep't of Defense</u>, 226 F. Supp.2d 227, 230-31 (D.D.C. 2002) (transferring because connection to DC was "attenuated" where D.C. officials were not actively involved in challenged decision).  The Court should reach the same conclusion here.

To be sure, Plaintiffs also challenge policies that apply nationwide, <u>i.e.</u>, Mathew's obligation to renew his fingerprints and employment authorizations.  If this were an APA case that raised only those claims, this Court might be an appropriate forum.  However, Plaintiffs' interest in those policies arises out of USCIS's application of the policies to Mathew, while it is adjudicating his adjustment application.  The Eastern District of Michigan is the locus of the

31

adjudication of that adjustment application.

The FBI's involvement in the background name check process also does not establish a close nexus to this District. The background checks are not initiated by the FBI. See Davis Decl. ¶ 2. The FBI's completion of those background checks is not monitored by USCIS in Washington, D.C., but rather by the Detroit District Office. See Pierce Decl. ¶ 4. Local officials at the Detroit District office conduct the decision-making process and will make the final decision. See id. ¶ 7. In sum, the FBI has a very routine role regarding Mathew's application — to conduct the background checks and send the results to USCIS. It does not determine whether, when, or how the adjustment application will be adjudicated. See Cannon Decl. ¶ 40. Accordingly, even if the FBI officer(s) processing Mathew's name check were located in Washington, D.C., that would not make this Court the proper forum.

Other private interest factors also support transfer. The Eastern District of Michigan is Defendants' choice of forum, and Defendants have legitimate reasons for the Court to transfer the case there. That district is the home jurisdiction of the Detroit District office, which is charged with and is responsible for adjudicating Plaintiff's pending adjustment application. See Pierce Decl. ¶ 7. Since this case arose in the Eastern District of Michigan, there is local interest in resolving it there. See Schmidt v. American Institute of Physics, 322 F. Supp.2d 28, 36 (D.D.C. 2004) (holding that cases should be resolved in the locale in which they arise.) That also makes the Eastern District of Michigan a more convenient jurisdiction in which to litigate this case because: (1) the people involved in making the determination as to Plaintiff's application are located in Detroit; and (2) documents or records related to the case are all located in Detroit. See Pierce Decl. ¶¶ 2, 7.

The public interest also favors transfer. The relevant considerations include: the

32

transferee's familiarity with governing laws, relative congestion of the calendars of the potential

transferee and transferor courts, and local interests in deciding local controversies at home.  <u>See</u>

<u>Trout Unlimited</u>, 944 F.Supp. at 16 (citation omitted); <u>Airport Working Group of Orange County,</u>

<u>Inc.</u>, 226 F. Supp.2d at 229.  Since this action concerns federal law, the Eastern District of

Michigan is as familiar with the applicable law as the District of Columbia.  In addition, there is

no evidence that the Eastern District of Michigan's docket is more congested than the District of

Columbia's docket.  <u>See</u> <u>Trout Unlimited v. United States Dep't of Agriculture</u>, 944 F.Supp. at

16.  Both factors weigh in favor of the Court transferring this case to the Eastern District of

Michigan.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court GRANT

Defendants' motion to dismiss or, in the alternative, TRANSFER this case to the Eastern District

of Michigan.

Dated: October 12, 2007                    Respectfully submitted,

   /s/   by RMM
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

   /s/  by RMM
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

_/s/ Robin M. Meriweather_
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198 Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

**Of Counsel**:

John Miles
Adjudications Division
Office of the Chief Counsel
U.S. Department of Homeland Security

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
JESNY ANN JOSEPH, et al.                    )
                                            )
                    Plaintiffs,             )
                                            )
        v.                                  )    Case Number: 1:07CV0393(PLF)
                                            )
MICHAEL CHERTOFF, Secretary, United States  )
Department of Homeland Security, et al.     )
                                            )
                    Defendants.             )
_____)

**ORDER**

        Upon consideration of Defendants' Motion to Dismiss or Transfer, it is this
_____ day of _____, 2007,

        _____ ORDERED that the Motion to Dismiss be and hereby is GRANTED, and that

        complaint be and hereby is DISMISSED;

        _____ ORDERED that the Motion to Transfer be and hereby is GRANTED, and that the

        case be and hereby is TRANSFERRED to the United States District Court for the

        Eastern District of Michigan.

                            SO ORDERED.


                            _____
                            UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JESNY ANN JOSEPH and
VINOD MATHEW,

Plaintiffs

v.                                              1:07CV00393

MICHAEL CHERTOFF, Secretary of the
Department of Homeland Security, et. al.

Defendants

## PERSONAL DECLARATION

I, the undersigned officer of the National Benefits Center, United States Citizenship and
Immigration Services, pursuant to 28 U.S.C. 1746, do hereby declare the following under
the penalty of perjury:

## DECLARATION OF DONNA B. DAVIS

I, Donna B. Davis, declare as follows:

1.      I am employed by the United States Citizenship and Immigration Services

        ("USCIS") as an Assistant Center Director for Adjudications with the National

        Benefits Center ("NBC"), in Lee's Summit, Missouri. I make this declaration

        based on my personal knowledge and my review of official documents and

        records maintained by the USCIS.

2.      This declaration is submitted in support of Defendants' motion to dismiss. This

        declaration provides a factual summary of the agency's adjudication policy as

        well as a review of the plaintiff's file. I have access to the electronic records of

        Plaintiff Vinod Mathew (Mathew), A96 500 068 and Plaintiff Jesny Joseph

(Joseph). I supervise NBC officers who initiated processing of Mathew's applications and Joseph's petition. On or about April 15, 2005, Joseph filed a Form I-130, Petition for Alien Relative and Mathew filed a Form I-485, Application to Register Permanent Residence or Adjust Status.

3.  The NBC serves as a clearinghouse and preprocessing center with respect to all family-based applicatons for Adjustment of Status. Primarily, NBC receives the applications, initiates the required security checks and ensures that certain minimum evidentiary standards have been met. NBC also adjudicates ancillary applications such as applications for Employment Authorization. Upon completion of its processing, the NBC makes the applications available for USCIS District Offices to conduct the required interviews. Once the case is scheduled for interview, the case is transferred to the District Office where all subsequent processing is conducted.

4.  When an adjustment application or other application seeking an immigration benefit on behalf of an alien is filed with USCIS, the agency conducts numerous mandatory criminal and national security background checks. These checks are conducted both to enhance national security and ensure the integrity of the immigration process. These security and background checks serve to screen out aliens who may seek to harm the United States and its citizens or who may be seeking immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. Pursuant to established agency policy, all required security checks

must be completed prior to adjudication of the application.

5.    The attached Fact Sheet explains the different types of checks that must be completed. (See Fact Sheet, dated April 25, 2006, a true and correct copy of which is attached hereto as Exhibit 1). The checks include the FBI fingerprint check, the DHS-managed Interagency Border Inspection System (IBIS), and the FBI Name Check. The FBI fingerprint checks provide information relating to criminal background within the United States. Results are usually received within days and while the vast majority result in no criminal record, positive results may have a direct bearing on the eligibility of an applicant for the immigration benefit being sought. The IBIS system contains records and information from more than 20 federal law enforcement and intelligence agencies including the Central Intelligence Agency (CIA), FBI and other divisions of the U.S. Department of Justice, the Department of State, DHS Customs and Border Protection (CBP) and other DHS agencies. It is a multi-agency effort with a central system that combines information from these various sources and databases to compile information regarding national security risks, public safety concerns, and other law enforcement concerns. IBIS provides, but is not limited to, information related to persons who are wanted criminals, persons of interest in the context of national security, and other derogatory information, including adverse immigration history. While the results of an IBIS query are usually available immediately, in some cases information found will require further investigation. Finally, the records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other

files compiled by law enforcement agencies. Although in the majority of FBI name checks no matches are found, some cases involve complex or highly sensitive information and cannot be resolved quickly.

6.    The security checks are required by sections 105 (a) and (b)(1) of the Immigration and Nationality Act (INA), which requires USCIS to use the information derived from "continuous liaison" with the FBI, CIA, and other internal security officers . . . in enforcing the [INA] in the interest of the internal … security of the United States" specifically as such information pertains to visa applicants, or applicants for admission to determine whether to issue a visa or admit an alien. These checks are authorized by sections 103(a), 235(d)(3) and 287(b) of the INA, 8 U.S.C. §§ 1103(a), 1225(d)(3), 1357(b), and have been implemented by regulation in 8 C.F.R. §§ 103.2(b)(7) ("The USCIS may require the taking of testimony, and may direct any necessary investigation..") and 245.2(a)(3) (specifically requiring the submission of Form G-325A, a biographic information form on which security checks have been historically instituted, as part of the adjustment of status application).

7.    Once NBC receives an I-485 a file is opened and an electronic record of that application is created. Much of this initial electronic processing and data entry is automated, including the automatic generation and electronic transmission of an FBI name check request in FBIQUERY, the FBI repository and tracking system for FBI Name Check requests. Once the initial file creation and processing of an I-485 application is complete, each file is placed on an interview ready shelf for and made available to the appropriate District Office for scheduling of the

interview. Once the case has been scheduled for interview, the case is shipped to the appropriate District Office, and NBC has completed its role in the adjudication of the application.

8.    In my capacity as Assistant Center Director for Adjudications with NBC, I have access to the electronic files and records of the USCIS. I have reviewed the system records for the Plaintiffs, which reflect that on April 15, 2005, Joseph filed a Form I-130, and Mathew filed a Form I-485 with the NBC. Shortly thereafter, USCIS automated systems initiated the required FBI name checks for Mathew. A name check is not required for Form I-130 for either the Petitioner, Joseph, or the Beneficiary, Mathew. USCIS records show that FBI acknowledged receipt of each of these requests, and they remain pending to this date. NBC has completed processing of these applications and on June 4, 2007, the files were transferred to the Detroit District office for interview. USCIS records show that on June 29, 2007, Joseph's Form I-130 was approved.

9.    Mathew also filed a Form I-765, Application for Employment Authorization, on March 12, 2006. That application was approved on May 30, 2007, and is valid until May 29, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _12_ day of _September_ 2007 at Lee's Summit, Missouri..

Donna B. Davis
Assistant Center Director, Adjudications
National Benefits Center

*Press Office*
**U.S. Department of Homeland Security**



# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

**How Immigration Security Checks Work**

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors.  Different kinds of applications undergo different levels of scrutiny.  USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—**  IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns.  USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case.  Results of an IBIS check are usually available immediately.  In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications.  The FBI fingerprint check provides information relating to criminal background within the United States.  Generally, the FBI forwards responses to USCIS within 24-48 hours.  If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS.  At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit.  Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations).  In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history.  Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications.  The FBI name check is totally different from the FBI fingerprint check.   The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement.  Initial responses to this check generally take about two weeks.  In about 80 percent of the cases, no match is found.  Of the remaining 20 percent, most are resolved within six months.  Less than one percent of cases subject to an FBI name check remain pending longer than six months.  Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits.  Most cases proceed forward without incident.  However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable.  Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS.  Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JESNY ANN JOSEPH and
VINOD MATHEW,

Plaintiffs

v.                      1:07CV00393

MICHAEL CHERTOFF, Secretary of the
Department of Homeland Security, et. al.

Defendants

## PERSONAL DECLARATION

I, the undersigned officer of the Detroit District Office, United States Citizenship and Immigration Services, pursuant to 28 U.S.C. 1746, do hereby declare the following under the penalty of perjury:

I.   <u>DOUGLAS S. PIERCE</u>   , declare as follows:

1.    I am employed by the United States Citizenship and Immigration Services (USCIS) as a Supervisory Adjudications Officer with the Detroit District Office, in Detroit Michigan. I make this declaration based on my personal knowledge and my review of official documents and records maintained by the USCIS.

2.    This declaration is submitted in support of Defendants' motion to dismiss. This declaration provides a factual summary of the agency's adjudication policy as well as a review of the plaintiff's file. I have custody of the USCIS records of Plaintiff Vinod Mathew (Mathew), A96 500 068, which contains the I-130 Petition filed by Plaintiff Jesny Ann Joseph (Joseph). I am a supervisor in the office that is processing Mathew's Application. On or about April 15, 2005,

Joseph filed a Form I-130, Petition for Alien Relative and Mathew filed a Form I-485, Application to Register Permanent Residence or Adjust Status.

3.    Applications for family-based adjustment of status, such as Plaintiffs' are filed with the National Benefits Center (NBC) in Missouri. As part of its processing, NBC initiates all required background checks, including a name check conducted by the FBI. Upon completion of its processing of the applications, NBC makes files available to the Detroit District Office for interview. An application may be scheduled for interview without awaiting the results of the FBI name check. Both NBC and the Detroit Office ensure that the name check request has been received by FBI, and that information is contained in USCIS automated records.

4..    All files related to applications whose name checks have not cleared are segregated and audited regularly in order to identify those in which a response from the FBI has been received. In this manner the agency ensures that as FBI responses are received, files are expeditiously released for adjudication. USCIS automated system reports do not provide USCIS with any indication as to what information the FBI may have relating to a particular alien, whether an FBI investigation into the particular alien has been undertaken, or whether there are national security concerns relating to that alien.

5.    For most applicants, USCIS can quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. However, due both to the sheer volume of security checks USCIS conducts, and the fact that USCIS must await responses from the FBI or other relevant agencies that conduct some of the required security checks, some

delays on individual applications are unavoidable and may be lengthy. Moreover, in some cases a background or security check will reveal that positive (derogatory) information on the subject alien is possessed by some agency other than USCIS without necessarily revealing the substance of that information. In such cases, USCIS works closely with the other law enforcement or intelligence agencies to obtain all available information concerning the positive result in order to properly evaluate its significance. Even where the FBI or a third agency has provided a final response, a case may still be considered pending where the response requires further investigation or review by USCIS or another agency. It is vitally important to thoroughly screen each applicant in order to resolve all concerns of a law enforcement or national security nature before determining that an individual is eligible for an immigration benefit.

6.    The FBI has an established process of processing FBI national security background investigation requests from USCIS chronologically based on the date the request is forwarded. If USCIS requests expedited processing of the FBI national security background investigation requests for a particular application or petition and it is moved up in the queue, it is at the expense of those still unadjudicated petitions or applications that bear an earlier filing date. There is no statutory or regulatory time limit for the adjudication of I-485s.  Moreover, an alien who has applied for adjustment of status may apply for and obtain employment authorization for the entire time his or her application is pending. Most applicants for adjustment of status may also apply for and obtain advance parole to enable them to travel abroad during the pendency of their application.

Thus, applicants for adjustment of status are not as adversely affected by delays in the adjudication of their applications as are aliens filing for other immigration benefits.

7.  In my capacity as supervisor in Detroit, I have access to the official files and records of the USCIS. I have reviewed the system records for the Plaintiffs, which reflect that on or about April 15, 2005, the Plaintiffs filed their respective application and petition. After reviewing the information pertaining to the Plaintiff, I attest to the following:

A.  NBC completed processing of Plaintiffs' applications and on June 4, 2007, the files were transferred to the Detroit District office for interview. The Detroit District Office maintains those files and will finally adjudicate the applications as provided below.

B.  On June 29, 2007, Joseph's I-130 petition was approved because that petition does not require the completion of an FBI name check.

C.  Upon the filing of Mathew's I-485 at the NBC, USCIS automated systems initiated the required FBI name checks for Plaintiff Mathew. USCIS records show that FBI acknowledged receipt of this request, and this check remains pending to this date. In accordance with the requirements and policies related to background investigations USCIS is prohibited from adjudicating Mathew's I-485 application, while this check remains pending. To date, Mathew's application remains pending awaiting the completion of national security background investigations. Once the

required national security background investigations are completed, Plaintiffs' applications can be adjudicated.

8. Although USCIS will request expedited processing of FBI name checks in certain instances, such circumstances do not exist in this case. Therefore, USCIS has determined that it will not request the national security agencies to expedite of their national security background investigation reports for clearance on Mathew's behalf at the expense of those petitions or applications with an earlier filing date. For this reason the USCIS cannot adjudicate plaintiff's I-485 application for adjustment of status, until such time as all national security background investigations are complete.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of __September__, 2007 at Detroit, Michigan.

DOUGLAS S. PIERCE
SAO
Detroit District Office, USCIS

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |
|---|---|
| VINOD MATHEW<br>JESNY ANN JOSEPH,<br><br>    Plaintiff,<br><br>    v.<br><br>MICHAEL CHERTOFF,<br>    et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No:<br>)    07-cv-393<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)　　I am currently the Section Chief of the National Name Check Program Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)　　In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)　　Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS").

Specifically, I am aware of the name check request for Vinod Mathew, the plaintiff in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)   The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

2

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)     The FBI's CRS enables the FBI to maintain all information which it has

acquired in the course of fulfilling mandated law enforcement responsibilities. The records

maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

compiled for law enforcement purposes. This system consists of a numerical sequence of files

broken down according to subject matter. The subject matter of a file may relate to an

individual, organization, company, publication, activity, or foreign intelligence matter. Certain

records in the system are maintained at FBI Headquarters. Records which are pertinent to

specific FBI Field Offices are mostly maintained at those Field Offices.

(6)     FBI Headquarters and each Field Division can access the CRS through the

FBI's General Indices. The General Indices are arranged in alphabetical order and consist of

indices on various subjects, including the names of individuals and organizations. Only the

information considered pertinent, relevant, or essential for future retrieval is indexed.

(7)     Communications directed to FBI Headquarters from various Field Offices

and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals,

groups, or organizations which are listed in the case captions or titles as subjects, suspects, or

victims. Searches made in the index to locate records concerning particular subjects are made by

searching the name of the subject requested in the index.

(8)     The entries in the General Indices fall into two categories:

  (a)     "main" entries – entries that carry the name corresponding
    with the subject of a file contained in the CRS.

  (b)     "reference" entries – entries (sometimes called "cross-
    references") that generally only mention or reference an

3

individual, organization, etc., that is contained in a document located in another "main" file.

(9)     In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system consists of the following three automated applications that support case management functions for all investigative and administrative cases:

(a)     Investigative Case Management:  This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads.  A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed.  The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation.  Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b)     Electronic Case File:  This application serves as the central electronic repository for the FBI's official text-based documents.  It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system.  All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c)     Universal Index:  This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases.  Only the Office of Origin is required to index.  However, the Lead Offices

4

may index additional information as needed. The Universal Index, which consists of an index of approximately 99.2 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references"

5

include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)   If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a close date of birth or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)   There are four stages involved in the completion of an individual name check: batch processing, name searching, file review, and dissemination. The first stage in the process, batch processing, involves the transfer of the name check requests from USCIS to the NNCPS on magnetic tapes. Each tape can hold up to 10,000 names. (Some requests are transmitted via facsimile or verbally via telephone.) The tapes are uploaded into an FBI system and the names are electronically checked against the FBI's Universal Index (UNI). Historically, during the batch processing phase, approximately 68 percent of the name checks submitted by USCIS are returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a

6

particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)   The second stage in the process is name searching. For the name check requests that are still pending after the initial electronic check, additional review is required. An FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS.

(15)   The third and fourth stages in the process are file review and dissemination. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(16)   Additional searches against the FBI's Universal Index, additional manual name searches, and/or additional file review of a name check request, depending on the length of time a name check request is pending in the processing queue, may occur periodically during the name check process to ensure that stale information is updated.

7

(17)    Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

(18)    At each stage of processing, the NNCPS generally works on the oldest name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly. However, if an applicant's name check requires a review of numerous FBI records and files, even though that person came in first, the name check may require additional time until all responsive records are located and reviewed.

(19)    The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis. USCIS determines which name checks are to be expedited based on criteria it determines. Once designated as an "expedite," that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the others waiting to be processed.

(20)    Another exception to the first-in, first-served policy is a near-term effort agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by prioritizing "single hit" name checks. This key initiative is explained in paragraph (33) below.

## GROWTH OF THE NAME CHECK PROGRAM

(21)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the

8

number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

(22)   A significant portion of the incoming name checks submitted over the past few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45% (~1,512,000) of the total incoming name checks were submitted by USCIS; and in fiscal year 2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS.

## USCIS NAME CHECK REQUESTS

(23)   In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(24)   In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with

9

then-pending applications for immigrations benefits for which the Immigration and Nationality

Act required background investigations. Those 2.7 million requests were in addition to the

regular submissions by the former INS. Currently, the FBI has returned an initial response to all

2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to

those resubmitted requests indicated that the FBI had no information relating to the specific

individual who was the subject of the request, approximately 16 percent – or over 440,000 –

resubmitted requests indicated that the FBI may have information relating to the subject of the

inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than

6,300 of those resubmitted requests remain pending.

        (25)    The FBI's processing of the more than 440,000 residuals has delayed the

processing of regular submissions from USCIS. A dedicated team within NNCPS has been

assigned to handle only these re-submitted name check requests. To the extent that the team

members are working on only these applications, they are unavailable to process the normal

submissions.

        (26)    There are numerous factors that have contributed to delays in the

processing of name check requests. One is the volume of incoming name checks – the total

volume of incoming name check requests combined with pending name check requests has

historically outpaced the NNCPS's available resources to process this volume. As it concerns

submissions by USCIS, for Fiscal Year 2006, USCIS submitted approximately 1,633,000 name

check requests, of which approximately 718,000 represented naturalization-related name checks

and approximately 658,000 represented adjustment of status-related name checks. As of the end

of Fiscal Year 2006, the NNCPS had over 364,600 pending USCIS name check requests, of

10

which over 157,300 represented naturalization-related name checks and over 157,800 represented adjustment of status-related name checks.

(27)    The number of "hits" on a name when it is reviewed may further contribute to a delay in processing a name check request. A "hit" is a possible match with a name in an FBI record. The number of times the name appears in FBI records correlates to the number of records which require review.

(28)    The processing of common names also contributes to a delay in processing a name check request. The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on. Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records. Common names can often have more than 200 hits on FBI records.

(29)    The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. If the date of the record predates October 1995, the paper record has to be located, retrieved, and reviewed; if the date of the record is later than October 1995, the record text may or may not be available electronically depending on the type of record and whether it has been uploaded electronically. A paper record could be at one of over 265 possible locations across the country. Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. One person's name check may involve locating and reviewing numerous files, all at different physical locations. Each request must be communicated internally from the NNCPS to the field, and handled according to the

11

current priorities of the particular field office. Since it is a paper based process, it is a process subject to misplaced or misfiled files. The process is time consuming and labor intensive.

(30)    Another contributing factor which was briefly mentioned earlier in this declaration is the expedited request. Processing an expedited case means that an employee is not available to work on a normal name check request.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(31)    The FBI is seeking a number of improvements to its process. Over the short-term:

(32)    NNCPS is continuing to develop the Name Check Dissemination Database ("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

(33)    NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks. For example, the FBI and USCIS have implemented a key initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name Check requests, that is, pending name check requests that have only one FBI file potentially identified with it that needs to be reviewed in order to process the request. By applying contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the pending USCIS name check workload.

(34)    The FBI is in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new

12

employees, thereby significantly decreasing the amount of time needed before a new employee

can begin to significantly impact the NNCPS workload. These efforts have led to the

development of a name check employee training manual.

(35) NNCPS, through the Records Management Division's Records

Automation Section, is scanning the paper files required for review in order to provide machine

readable documents for the Dissemination Database. It is also building an Electronic Records

System that allows for future automation of the name check process.

(36) NNCPS is working with customers to streamline incoming product and to

automate exchange of information.

(37) As a mid-term improvement, NNCPS is exploring technology updates to

the name check process. Specifically, the FBI procured textual analysis software in order to

investigate ways to further automate the name check process. The goal is to incorporate

analytical software applications that reduce the time spent to verify the identity of the individual

and, once verified, assists in the adjudication analysis. This type of automation should decrease

the time required to process a name check, thereby increasing production. The FBI is building a

proof of concept system for eventual integration into the FBI's core databases.

(38) As a long-term improvement, the FBI is developing a Central Records

Complex that will create a central repository of records. Currently, paper files/information must

be retrieved from over 265 locations throughout the FBI. The Central Records Complex will

address this issue, creating a central repository-scanning of documents, and expediting access to

information contained in billions of documents that are currently manually accessed in locations

around the United States and world. In addition, the essential long term improvement for FBI

13

Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check services. Once in place, the FBI will be able to scale resources proportionally with workload demands – pending name checks will pay for themselves. At this time fees do not cover the basic costs of providing the service. Therefore, the FBI cannot adequately apply resources to processing name checks without pulling critically needed personnel and funding from other programs. The FBI procured services to conduct a study to determine an appropriate fee structure. This study is in its final phase.

(39)    For the reasons stated earlier, the FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited at the request of USCIS, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of expedited name checks the analyst must process for, among others, military deployment, "age-outs," sunset provisions such as Diversity Visa cases, compelling reasons such as critical medical conditions, and loss of Social Security or other subsistence; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. Unfortunately, the proprietary software NNCPS utilizes to process name checks does not report where in the processing queue a particular name check request may lie vis-à-vis other name checks. Additionally, until review of each case is undertaken no estimate for the time required to complete it can even be attempted, no estimate can be made as to when the plaintiffs' cases will be reached by NNCPS staff, nor can any reliable estimate be made as to how long it will take to

14

complete the review once it has begun. While the FBI is sensitive to the impact of the delays in

processing name check requests, the consequence of the FBI's mission on homeland security

requires that its name check process be primarily focused on providing accurate and thorough

results. When the name check is completed, the FBI provides the results to USCIS as quickly as

possible.

(40)    It is important to note that the FBI does not adjudicate applications for

benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a

summary of available information to USCIS for its adjudication process.

### PLAINTIFF'S NAME CHECK REQUEST

(41)    The name check request for plaintiff Vinod Mathew was received by the

FBI from USCIS on or about April 27, 2005 and has not been completed. The FBI is performing

its check in response to USCIS's request in accordance with the procedures outlined above. The

results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in

accordance with the FBI's normal protocol.

(42)    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true and correct to the best of my knowledge and belief.

Executed this 2 4th day of September 2007.


MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.


15